**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LI QUNZHU,<br>LI LI, | |
| **Plaintiffs,** | **CASE NO.** |
| v. | **JURY DEMAND** |
| CHINA PETROLEUM & CHEMICAL CORPORATION (SINOPEC),<br>PETROCHINA COMPANY LIMITED (PETROCHINA),<br>SINOPEC RESEARCH INSTITUTE OF PETROLEUM PROCESSING CO., LTD (RIPP), | |
| **Defendants.** | |

# COMPLAINT

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF UNDER THE SHERMAN ACT

## JURY TRIAL DEMANDED

# I. JURISDICTION AND VENUE

1. **SUBJECT-MATTER JURISDICTION**

The far superior technical, economic, energy-saving, and carbon-reduction performance of cold regenerated catalyst cycling (CRC) technology—along with its uniqueness and irreplaceability—stems from its "tenfold economic benefit" and its ability to reduce carbon emissions by 70 kg per ton of feed compared with that of all leading traditional fluid catalytic cracking (FCC) licensors. Sinopec (including RIPP) and PetroChina engaged in an eight-year systematic, cross-border conspiracy to discredit and suppress Plaintiffs' core green CRC technology—using false data and false statements disseminated through fraudulent SEC filings, industry defamation, and meritless patent-blocking tactics lacking factual or legal basis—to exclude and restrict competitors and hinder their entry into the U.S. and other overseas markets, thereby monopolizing the U.S. and global markets. In particular, these false statements and fabricated data, disseminated through Wall Street channels in U.S. and global markets, have discredited and undermined CRC technology while elevating their own MIP technology. This constitutes an ongoing violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. New York served as the central hub for planning and execution (see paragraphs 52–55); federal question jurisdiction applies under 28 U.S.C. § 1331. This action arises under federal antitrust statutes (15 U.S.C. §§ 1, 2, 26). This Court has original subject-matter jurisdiction pursuant to 28 U.S.C. § 1331.

2. **PERSONAL JURISDICTION**

Valid specific personal jurisdiction attaches to Defendants under the Fourteenth Amendment Due Process Clause, Fed. R. Civ. P. 4, and the substantial-effects doctrine specific set forth in *Hartford Fire Ins. Co. v. California*, 509 U.S. 764 (1993)—which confirms that foreign

defendants may be subject to U.S. antitrust jurisdiction if their conduct produces "foreseeable and substantial" harm in the United States—consistent with the minimum contacts standard from *International Shoe Co. v. Washington,* 326 U.S. 310 (1945). The alleged horizontal anticompetitive conspiracy spanned 2018 through September 8, 2022—the statutory effective date of Defendants' NYSE delisting via SEC Form 25 filed August 29, 2022. The Defendants' collusive restraint on global fluid catalytic cracking (FCC) technology licensing—including U.S.-based patent blocking and false SEC filings—was purposefully directed at U.S. foreign petroleum commerce and produced foreseeable and substantial harm within the United States, "minimum contacts are determined based on the defendant's conduct at the time of the alleged wrongdoing"—post-conspiracy voluntary delisting cannot retroactively erase the purposeful minimum contacts established during the unlawful conduct. This Court invokes only personal jurisdiction (not general all-purpose jurisdiction, see *Goodyear Dunlop Tires Operations, S.A. v. Brown,* 564 U.S. 915 (2011)) for this antitrust action.

3. **VENUE**

Sinopec and PetroChina were NYSE-listed companies that voluntarily and proactively subject themselves to regulation by the New York Stock Exchange and the SEC; therefore, venue is properly laid in the Southern District of New York, where the two Defendants reside or are found, pursuant to 15 U.S.C. § 22 (see paragraphs 52–54). RIPP—originally a branch of Sinopec—does so as well.

Venue is alternatively proper under 28 U.S.C. § 1391 on two independent grounds:

(1) Primary statutory basis under § 1391(b)(2): a substantial part of the events occurred, and the alleged injuries were suffered, in giving rise to Plaintiffs' Sherman Act claims are

transmitted, manifested, and concentrated within the Wall Street-centered international energy and financial markets of New York—the core hub for U.S. foreign petroleum trade.

(2) Alternative basis under § 1391(b)(3) and § 1391(c)(2): A foreign corporate defendant is deemed to reside in any judicial district where valid specific personal jurisdiction exists over it in this action. As this Court possesses lawful specific personal jurisdiction over Sinopec and PetroChina herein, venue is independently proper in this District.

4. **STATUTE OF LIMITATIONS**

Private treble damages claims under the Sherman Act are subject to a four-year limitations period codified at 15 U.S.C. § 15b. This action is timely to recover all compensatory economic damages accruing continuously from the commencement of the conspiracy in 2018 up to the date of filing, supported by two well-established equitable and substantive antitrust doctrines:

First, the continuing-conspiracy doctrine recognized in *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971)—under which each successive overt act (e.g., meritless patent-blocking tactics lacking factual or legal basis, making defamatory statements about CRC technology) taken to implement and perpetuate the collusive scheme restarts the limitations period, permitting full recovery of damages stemming from the entire course of the long-running conspiracy.

Second, equitable tolling applies due to Defendants' fraudulent concealment of the unlawful agreement. Defendants deliberately structured the conspiracy as an off-the-record tacit understanding without written documentation to avoid detection, thus tolling the limitations period until Plaintiffs acquired actual knowledge of the alleged agreement or its operation.

Claims for permanent injunctive relief under 15 U.S.C. § 26 are entirely exempt from this

four-year limitations bar.

## 5. LEGAL BASIS FOR FULL RECOVERY OF EXTRATERRITORIAL FOREIGN LOSSES UNDER THE FTAIA (15 U.S.C. § 6a)

### A. Statutory framework of the FTAIA

The FTAIA generally bars antitrust claims based solely on foreign anticompetitive conduct—unless one of its two statutory exceptions applies. Both exceptions apply here, consistent with *F. Hoffmann-La Roche Ltd. v. Empagran S.A.,* 542 U.S. 155 (2004) (interpreting FTAIA's "direct, substantial, and reasonably foreseeable effect" standard):

(1) First exception — "import commerce": Restricting CRC technology directly increased production costs and carbon dioxide emissions for U.S. petroleum enterprises, thereby increasing the cost of petroleum imports into the United States—satisfying FTAIA's "affecting import commerce" exception.

(2) Second exception — "domestic-effects ": Defendants coordinated global patent blocking in New York (e.g., retaining U.S. patent counsel in Manhattan to file false USPTO oppositions), which is directly related to commercial activities within the United States (e.g., the potential licensing of CRC technology to U.S. refineries)—satisfying FTAIA's " domestic-effects " exception.

### B. Standing of foreign plaintiffs to recover extraterritorial treble damages

***Pfizer** Inc. v. Gov't of India,* 434 U.S. 308 (1978) confirms that foreign entities qualify as protected "persons" under Clayton Act § 4, with no nationality-based bar to recovering domestic or worldwide treble damages (payable in any foreign currency). Plaintiffs, as foreign inventors, fall within this protected class.

For illustrative purposes, the Ninth Circuit's January 8, 2026 decision in *Seagate Tech. LLC*

*v. NHK Spring Co., Ltd.*, No. 24-4470, reinforces this principle: Where a defendant's U.S.-based patent and legal operations act as the "command center" for a global anticompetitive scheme, all foreign damages directly linked to that scheme are recoverable as treble damages under 15 U.S.C. § 15, regardless of where the asserted losses were sustained.

## II. PARTIES

6. Plaintiff 1: LI QUNZHU, Residential Address: Huibin Mansion, Compound No.8, Beichen East Road, Yayuncun, Chaoyang District, Beijing, the People's Republic of China, Phone : +86 13511013479, Email: ha8528@vip.163.com.

7. Plaintiff 2: LI LI, Residential Address: Huibin Mansion, Compound No.8, Beichen East Road, Yayuncun, Chaoyang District, Beijing， the People's Republic of China, Phone: +86 13303796279, Email: ha8528@vip.163.com

8. Defendant 1: China Petroleum & Chemical Corporation (Sinopec). Unified Social Credit Code: 91110000710926094P. Registered Address: No. 22 Chaoyangmen North Main Street, Chaoyang District, Beijing, the People's Republic of China. Former NYSE Ticker: SNP. Legal Representative: HOU Qijun.

9. Defendant 2: PetroChina Company Limited (PetroChina). Unified Social Credit Code: 91110000710925462X. Registered Address: Intercontinental Building, No. 16 Ande Road, Dongcheng District, Beijing, the People's Republic of China. Former NYSE Ticker: PTR. Legal Representative: DAI Houliang.

10. Defendant 3: Sinopec Research Institute of Petroleum Processing Co., Ltd. (RIPP). Institution Registration No.: 91110108MABM7W643L. Address: No. 18 Xueyuan Road, Haidian District, Beijing, the People's Republic of China. Legal Representative: LI

Mingfeng.

## III. PLAINTIFF STANDING AND PARTIES

11. **Cold Regenerated Catalyst Recycle (CRC) Technology and Patent Ownership** Plaintiffs Li Qunzhu and Li Li are the original inventors and core right holders of CRC cold regeneration catalyst recycle technology.

12. **Patent 1:** Chinese Patent: ZL200810146601.8, U.S. Patent Application No.： 13/576,565, EPO Application No.： 10845485.1, filed by Li Li with Li Qunzhu as joint inventors, with corresponding PCT applications filed in the U.S. and Europe has been granted two patents. Full beneficial rights in USPTO and EPO are held by the two individual Plaintiffs.

13. **Patent 2:** Chinese Appl. No. 201510004405.7, U.S. Patent Application No.： 15/541,379, filed by Li Qunzhu, corresponding PCT application in the United States has been granted two patents. Full beneficial rights in USPTO and EPO are held by the two individual Plaintiffs.

14. Li Qunzhu and Li Li qualify as proper individual plaintiffs with full standing to bring this action. UniCleanTech Company Ltd (UCT) holds a U.S. exclusive license agreement and global re-licensing rights, but has not yet completed full patent assignment formalities, so UCT is omitted for now and will be joined later. Clean Technology Limited (HKCT) holds complete title to core patents. **Since there is no legal representation, UCT and HKCT—both qualified plaintiffs—cannot currently be listed as** plaintiffs **due to the absence of counsel.**

15. Additionally, Sinopec and PetroChina were delisted from the New York Stock Exchange in September 2022. The key original evidence—including internal communications and

investor presentation materials—faces severe risks of archival purging, loss, or destruction; as a result, portions of historical records can no longer be fully retrieved. Plaintiffs are in the process of retaining U.S.-qualified antitrust and patent counsel; retainer formalities are pending. Plaintiffs will complete all agency procedures as soon as practicable and are also advancing national energy-saving and carbon-reduction standard certification for CRC technology—all of which require reasonable time to complete. Therefore, plaintiffs will file **a motion together requesting an extension of the trial schedule with this Court and request at least three months** to amend the complaint and add or substitute plaintiffs or defendants.

16. The two inventors (Li Qunzhu and Li Li) are entitled to 97% of the patent technology licensing fees, while *only and irreplaceable* Luoyang Weida Petrochemical Engineering Co., Ltd. (whose rights have been transferred to HKCT) is entitled to the remaining 3% as well as all other fees—such as process package preparation, engineering design, and consulting services.

17. Sinopec, RIPP—the owner of the Multi-Isoparaffins Production (MIP) process—and PetroChina have long formed an **MIP alliance,** in which RIPP was originally a branch of Sinopec, and both were the main planners and implementers of the conspiracy in this case, with PetroChina serving as their strategic ally. Therefore Sinopec (including RIPP) shall bear full liability for compensation, and PetroChina shall bear joint liability.

## IV. THE FACTUAL BACKGROUND OF THIS CASE

The fundamental facts of this case are a continuing conspiracy to undermine and suppress CRC technology and elevate MIP technology in order to obstruct and restrict competition in

violation of U.S. antitrust law under Sections 1 and 2 of the Sherman Act.

**A. The far superior technical, economic, energy-saving, and carbon-reduction performance of CRC technology—along with its uniqueness and irreplaceability—** stems from its "tenfold economic benefit" and its ability to reduce carbon emissions by 70 kg per ton of feed over that of all leading traditional FCC licensors.

18. CRC technology represents a completely new and revolutionary catalytic cracking reaction pathway, significantly outperforming all currently leading conventional catalytic cracking technologies. It successfully resolves the long-standing 60-year challenge in the FCC industry—the thermal balance limitation within the reaction-regeneration system—and, for the first time, enables independent and flexible adjustment of the catalyst-to-oil ratio (C/O) in commercial units.

19. Compared to the most advanced existing conventional technologies worldwide—including those from UOP, KBR, and Axens—CRC technology is far ahead, delivering economic benefits more than tenfold greater and achieving a $CO_2$ reduction of 70 kg per ton of feed.

20. Operating data from 22 commercial units, together with verification by an independent third party, show the following results: (1) a 2.0 percentage point increase in light product yield; (2) a 25.6% reduction in $CO_2$ emissions; (3) a 23.2% decrease in energy consumption; (4) $26 in additional profit per ton of feedstock; and (5) a payback period of just 1.5 months.

21. CRC has also received a green-innovation certification, was included in the World Intellectual Property Organization's (WIPO) Green Technology Database in 2022, and won four consecutive international invention gold awards in London, Nuremberg, and Geneva between 2023 and 2024.

22. **Potential Market and Alleged Damages in the United States and Worldwide:** Given

the global annual catalytic cracking (FCC) processing capacity of 1 billion tons, CRC could reduce approximately 70 million tons of $CO_2$ emissions annually, with an estimated market value exceeding $26 billion per year. Currently, no traditional technology currently available worldwide can simultaneously achieve high C/O ratios and high catalyst activity. **CRC is the only comprehensive optimization technology for FCC reaction-regeneration systems.** Therefore, **CRC technology is the only and irreplaceable solution, suitable for all types of FCC units**. For details, see Evidence 2, which consists of 34 items demonstrating CRC's clear technological superiority.

23. Given CRC's significantly superior performance, in a fair and open competitive environment, Plaintiffs could have successfully expanded into global markets—including the United States, Europe, and Asia—with corresponding and the resulting revenues would have constituted reasonably foreseeable business opportunities or income. However, aware that its own MIP technology could not compete on an equal footing with CRC, the MIP alliance deliberately orchestrated a sustained global suppression campaign to block CRC's access to global market. Through fabricated production data, false statements, patent interference, and industry defamation (see evidence 3), it allegedly excluded CRC technology from the U.S. market.

**B. After failing in the invalidation lawsuit against Patent No. 1 in China, the MIP Alliance continued to abuse its overwhelming market influence by colluding globally to suppress and discredit CRC technology.** In fact, Sinopec's refining capacity is nearly twice that of ExxonMobil, the largest refiner in the U.S.. when combined with PetroChina's capacity, it exceeds ExxonMobil's by more than threefold.

24. Since early 2018, the MIP Alliance has colluded with King & Wood Mallesons (KWM)

(Beijing) and New York agency—**using Beijing as the central planning and operational hub and New York as the core planning and operational center** for U.S. and global suppression—to launch a systematic, factually unfounded, and legally unjustified an eight-year campaign challenging the validity of CRC's core patents before the United States Patent and Trademark Office (USPTO), the China National Intellectual Property Administration (CNIPA), and the European Patent Office (EPO). This campaign includes malicious patent litigation, covert manipulation of, obstruction of, and interference with administrative procedures such as patent examination and appeal processes (see detailed explanations of the patent litigation and examination history in Evidence 4, 5, and 6).

25. The MIP Alliance has deliberately undermined the technical advancement and inventive step of CRC's core patents—which are widely recognized as industry-leading—in order to elevate its own MIP technology. This effort aims to exclude and restrict competition, disparage and suppress CRC technology, and thereby obstruct the widespread adoption and commercialization of CRC technology in China, the United States, Europe, and other global markets.

26. The MIP Alliance, through the New York agency and/or other global law firms or companies, has engaged in covert operations to maliciously obstruct and interfere with administrative patent examination and appeal procedures in the United States and Europe, resulting in the rejection of two U.S. patent applications without any factual or legal basis. This has also caused severe delays in the EPO examination of Patent 1 at issue, with no examination outcome issued even though the patent is only two years away from expiration. The objective is to coordinate with Chinese patent invalidation proceedings, appeals, and administrative litigation to maliciously undermine the advancement and inventiveness of

CRC's core patents, thereby elevating its own MIP technology, and aiming to exclude and restrict competition, disparage and suppress CRC technology, and hinder international commercialization and deployment of CRC technology in the United States and elsewhere. (See details on the conspiracy to interfere with USPTO examination and appeal procedures, and related explanations; see Evidence 5-A1, Involved Patent 1; 5-A2, Involved Patent 2.)

**Patent 1** (ZL 200810146601.8) **at the CNIPA**

27. **KWM was originally the legal counsel to PetroChina.** The MIP Alliance colluded maliciously with it and, without factual or legal basis, filed a petition for retrial with the Supreme People's Court of China on May 20, 2018. Subsequently, it obtained case-filing approval based on fabricated so-called "self-admissions" concocted by its partners. After serving Plaintiffs with a summons, the court issued a retrial judgment on January 28, 2019, overturning the second-instance final judgment without holding a hearing—recognized as one of **Beijing's Top Ten** Intellectual Property Litigation Case Examples—without any factual or legal foundation.

28. In fact, the retrial application fabricated four entirely non-existent facts and arguments: (1) the second-instance judgment's violation of the "principle of maximum reasonable interpretation"; (2) the patentee's claim of a "special structure, special technical effect, and special meaning of the mixed buffer space"; (3) the alleged "exchange of disclosure for protection"; and (4) the alleged "double profit for the patentee"—four baseless assertions in total. *(see Evidence 4).*

29. After the unjust judgment, over 856 pages of new evidence submitted by Plaintiffs during the protest proceedings, the subsequent invalidation process, and the first- and second-instance trials were deliberately excluded from review in each of these proceedings over a

period of more than 8 years, resulting in procedural recycling without factual or legal basis.

30. In the new round of proceedings, Plaintiffs were systematically deprived of core procedural rights, including the right to present evidence, the right to cross-examine, and the right to argue. The panel declared all claims of the patent invalid without factual or legal justification, while the first-instance court upheld the decision despite the absence of factual or legal basis.

31. Currently, the new pending second-instance proceeding also involves clear and serious violations of legal procedure, including the fact that HKCT—New patentee after the change—has not received the required legal documents as mandated by applicable laws and regulations. (See evidence 4)

32. In proceedings concerning two other granted CRC patents, Plaintiffs were also denied fundamental procedural rights during the invalidation review proceedings. The panel declared all claims of one patent invalid without any factual or legal basis in the first-instance procedure; the first-instance judgment for the other patent was likewise upheld without factual or legal justification, and it is currently under the second-instance.

**Two Patents at USPTO**

33. The Federal Circuit's directive in Ball Aerosol was addressed to a lower court, but it applies to Office personnel as well. When setting forth a rejection, Office personnel are to continue to make appropriate findings of fact as explained in MPEP §§ 2141 and 2143, and must provide a reasoned explanation as to why the invention as claimed would have been obvious to a person of ordinary skill in the art at the time of the invention. This requirement for explanation remains even in situations in which Office personnel may properly rely on intangible realities such as common sense and ordinary ingenuity.

Those final rejections lack factual support and fail to comport with judicial precedent and USPTO guidance. The Examiner's rejection, the PTAB's decision, and the CAFC's judgment all disregarded the Examiner's burden of proof set forth in the legal precedent cited in MPEP § 2144.03(C) and (E), those decisions should therefore be reversed.

**<u>Patent 1</u> (see** Evidence 5-A1)

34. During the administrative patent examination proceedings—including AFCP 2.0, pre-appeal conference, appeal before the Patent Trial and Appeal Board (PTAB), continued examination following an RCE, and second appeal—the examiners, the PTAB, and the U.S. Court of Appeals for the Federal Circuit (CAFC) collectively disregarded established procedural requirements and substantive legal standards in rejecting U.S. Patent Application No. 13/576,565.

35. This rejection lacks factual support and fails to comport with governing statutory provisions, judicial precedent, and USPTO guidance.

36. In particular, the Examiner, the PTAB, and the CAFC all disregarded or overlooked Examiner's burden of proof set out in legal precedent cited in MPEP§ 2144.03 (C),(E), and the "as a whole" principle laid down in the MPEP §§ 2141 and 2143, thereby mistakenly and expansively interpreting "the scope and contents of prior art" and "the level of ordinary skill in the art" from "before the filing date" to the level of "after the filing date" through **the "reverse reasoning "**, which resulted in two instances of impermissible hindsight reasoning.

37. This case has spanned 14 years. Plaintiffs submitted a 631-page submission, clearly detailing the authenticity and relevance of all submitted evidence (Annexes 1–54), which adequately addresses the Examiner's findings. In contrast, the Examiner—without

providing any documentary evidence supporting the rejection —disregarded all such submissions. The sole basis for rejection was that "Li discloses all claimed elements of features 1 and 2."

38. The Examiner's rejection, the PTAB's decision, and the CAFC's judgment rely solely on legal conclusions drawn from case law as their rationale, without citing any factual findings or documentary evidence in support. Accordingly, they are inconsistent with the requirements of MPEP §§ 2141, 2143, 2144.03(C) and (E), and 2145. **Therefore, the Examiner's rejection, the PTAB's decision, and the CAFC's judgment should be reversed.**

**Patent 2** **(see** Evidence 5-A2)

39. During the administrative patent examination proceedings—including four RCEs, an appeal before the Patent Trial and Appeal Board (PTAB), and continued examination following an RCE—the Office departed from established procedural requirements and substantive legal standards in its rejection. This rejection lacks factual support and fails to comport with governing statutory provisions, judicial precedent, and USPTO guidance.

40. Especially, the Examiner and the PTAB all disregard or overlooked the Examiner's burden of proof set out in legal precedent cited in MPEP §§ 2144.03(C) and (E) , and the "as a whole" principle laid down in the MPEP §§2141 and 2143, thereby mistakenly and expansively interpreting "the scope and contents of prior art" and "the level of ordinary skill in the art" from "before the filing date" to the level of "after the filing date" through **the "reverse reasoning "**, which resulted in two instances of impermissible hindsight reasoning.

41. Appellants submitted a total of seven pieces of evidence, clearly detailing the authenticity and relevance of all evidence (Annexes 1–7), which adequately traverses the Examiner's findings. In contrast, the Examiner disregarded all such submissions without providing any documentary evidence supporting the rejection.

42. The Examiner's rejection and the PTAB's decision rely solely on legal conclusions drawn from case law as their rationale, without citing any factual findings or documentary evidence in support. Accordingly, they are inconsistent with the requirements of MPEP §§ 2141, 2143, 2144, 2144.04, 2144.03(C) and (E), and 2145.

43. In particular, throughout those proceedings, Plaintiffs repeatedly submitted written evidence to rebut the examiner's interpretation of the distinguishing feature defined by functional language, in accordance with MPEP §§2141 and 2143. **Accordingly, the Examiner's rejection and the PTAB's decision should be reversed.**

**C. On the other hand, this is a continuing conspiracy to fabricate false annual or periodic reports filed by NYSE-listed companies**—aimed at suppressing and degrading CRC technology and elevating MIP technology in order to obstruct and restrict competition.

44. **Three factual items are as follows:**

(1) Sinopec deliberately concealed and failed to disclose that three core MIP patents were subject to invalidation proceedings (see Evidence 6);

(2) The MIP Alliance conspired with KWM to falsify production technology data, intentionally concealing the economic losses and increased $CO_2$ emissions caused by MIP technology. Operation of MIP units with a combined processing capacity of 150 million metric tons per year results in annual economic loss of 48 billion RMB for China's refining

enterprises and an additional annual $CO_2$-emission increase of 19.8 million tons (see Evidence 3);

(3) Defendants deliberately failed to report a major lawsuit in which Sinopec was sued for patent infringement based on the alleging that Defendants' use of MIP technology infringed CRC-related patent rights, in which the plaintiff sought RMB 8.08 billion in damages from Sinopec and RIPP (see Evidence 7).

45. By publishing these false statements and fabricated production data in periodic reports filed in the U.S. securities market, the MIP Alliance has disparaged CRC technology while overstating the performance of MIP technology—a clear case of "greenwashing."

46. The circulation of these alleged false statements and fabricated data through Wall Street channels is, in fact, a malicious act by the MIP Alliance to support covert interference with patent examination, appeal, and invalidation proceedings before the USPTO, the EPO, and the CNIPA. The fact that multiple CRC technology retrofit projects implemented by PetroChina-owned enterprises achieve technical and economic performance allegedly ten to several dozen times better than that of MIP technology or other leading conventional FCC technologies—and deliver remarkable energy-saving and carbon-reduction benefits constitutes objective evidence of non-obviousness under MPEP §§ 716 and 2145.

47. **In summary,** these false statements and malicious patent litigation (secret interference in examination and appeal processes) have direct, substantial, and reasonably foreseeable impacts on markets in the United States, Europe, and globally. They have directly prevented the significantly superior CRC technology—which provides measurable technical, economic, energy-efficiency, and emissions-reduction benefits—from entering the U.S., European, and global markets. CRC technology—from which proven,

measurable ten to several dozen times better technical and economic performance and energy efficiency/carbon reduction benefits compared to that of currently available state-of-the-art traditional technologies (see Evidence 2)

48. After Sinopec and PetroChina delisted their securities from the New York Stock Exchange in early September 2022, the MIP Alliance continued to abuse its overwhelming market influence by secretly pressuring or misleading leading traditional FCC technology providers, equipment and catalyst suppliers, and consulting or engineering firms in the U.S. and Europe into colluding with the MIP Alliance to undermine CRC technology.

49. At the same time, the MIP Alliance fabricated numerous rumors—such as claims that CRC technology poses security risks and has poor operational stability—to discredit CRC technology and disseminate those rumors globally through the new alliance. （see Evidence 3).

50. As a result, dozens of industry associations, consulting firms, EPC companies, and manufacturers in the U.S., Europe, South Korea, and Singapore unjustifiably refused to deal, delayed or declined to respond for various stated reasons—such as “long-term service-binding” and “long-term confidentiality agreements”. (see Evidence 8).

**D. This continuing tacit conspiracy has disrupted the fair competitive environment for global green technologies.**

51. The MIP Alliance’s conspiracy—through the use of false data and market restrictions—has undermined CRC technology by disparaging its value, exaggerating its own environmental credentials, and orchestrating extensive “greenwashing” across numerous participating companies. This conspiracy has disrupted the fair competitive environment for global green technologies. The collusion has also misled governmental and private

institutions in multiple countries, thereby securing implicit support for such conduct—a violation of the Paris Agreement's core objectives—that has obstructed the adoption and deployment of CRC technology, a demonstrably more energy-efficient, carbon-reducing solution, in China's market and international markets, including those of the United States, Europe, and Asia. This has severely undermined the global public interest in climate protection and sustainable development goals.

52. **In view of the above,** the aforementioned covert interference with USPTO patent examination procedures and SEC false statements have directly impacted the global market for energy-saving and carbon-reduction technologies in the petrochemical industry—including those in the United States, China, Asia, Europe, and beyond—through Wall Street securities markets, investment banks, and USPTO announcements, significantly affecting the economic performance of petrochemical enterprises in the U.S..

53. The defendants—leveraging their status as New York Stock Exchange–listed companies targeting the U.S. market—colluded to plan and execute a global campaign to undermine and devalue CRC technology. Over the past eight years, this coordinated suppression strategy has been strategically planned and implemented from Beijing (the primary planning and execution hub) and New York (a key planning center and operational nexus). The New York capital markets served as a main channel for carrying out and disseminating these harms, satisfying the constitutional minimum contacts requirement under 15 U.S.C. §22, that there is a strong connection among Defendants, the court, and the contested conduct.

54. Defendants' activities—including roadshows in New York, engagement with Wall Street investment banks, SEC misrepresentations, and communications with institutional

investors—all constitute "transacting business within the Southern District of New York" (SDNY), fully meeting the statutory requirements for venue.

⑴ **Conspiring in New York to secretly interfere with the patent examination and appeal processes before the USPTO, the CNIPA, and the EPO, systematically and over a long period denying the validity and patentability of CRC's core patents without a factual or legal basis, thereby undermining and suppressing the innovation and commercial value of CRC technology.**

⑵ Conspiring in New York to fabricate false statements and falsified technical data that reached U.S. clients and American investors, **downplaying CRC technology's superior technological advancement and its "tenfold economic benefit" and its ability to reduce carbon emissions by 70 kg per ton of feed**—thereby directly harming the U.S. domestic market for energy-saving and carbon-reduction technologies in the refinery sector and the financial performance of related enterprises. **These damages are direct, substantial, and reasonably foreseeable—constituting the core factual basis for establishing the court's jurisdiction.** The MIP alliance deliberately orchestrated a sustained global suppression campaign to block the global market. Through fabricated production data, false statements, patent interference, and industry defamation (see evidence 3), it blocked CRC's entry into the U.S. market, resulting in the exclusion of CRC technology from the U.S. market. **Clearly, this contradicts market logic and business principles,** given CRC technology's **"tenfold economic benefit"** and its ability **to reduce carbon emissions by 70 kg per ton of feed**. At a minimum, it is conservatively estimated that CRC should have captured 50% of the U.S. FCC unit market over the past eight years. The damages directly suffered in the U.S. market are a decrease of approximately $3.25

billion annually and an increase of approximately 8.75 million tons of $CO_2$-emission annually, based on the FCC's total processing capacity of 250 million tons per year. **This harm occurred directly within the United States, was substantial, and was reasonably foreseeable—constituting the core factual basis for establishing this Court's jurisdiction.**

(3) By disseminating these false statements and fabricated production data through Wall Street, they sought to discredit CRC technology while lifting up their own MIP technology—direct support for the MIP Alliance's covert interference with USPTO patent-grant procedures.

55. **The damages of Plaintiffs:** Conservatively estimated, the damages (only license fee) directly suffered by Plaintiffs amount to approximately $3.25 billion over the past eight years, based on 50% of the total global processing capacity of FCC units, which is 1 billion tons per year.

**E. <u>This is a continuing tacit conspiracy</u>—a continuing antitrust violation**—that manifests as an unwritten, horizontal oligopolistic agreement among competitors.

56. **Consistency in Market Behavior and Anticompetitive Motives**

This case of illegal tacit collusion arises from two convergent economic incentives: First, Sinopec's Research Institute of Petroleum Processing (RIPP) seeks to preserve its dominant 70% market share in China for MIP technology. RIPP has closely aligned its interests with those of senior executives at Sinopec and PetroChina—ostensibly to uphold institutional research prestige but functionally to entrench their personal commercial gain. Second, international FCC technology licensors—including UOP, Axens, KBR—collectively hold over 90% of the global commercial licensing market for FCC

technologies. These entities share a structural incentive to impede the international deployment of Plaintiffs' advanced CRC technology, thereby safeguarding their long-standing oligopolistic pricing power and market control. (See Evidence 10 )

57. **Communication Channels and Coordinated Conduct**

Sinopec and PetroChina operate some of the world's largest refining systems and participate in major petrochemical markets—strategic assets that constitute primary targets for leading global technology providers. Within this broad sector, FCC technology represents only a technical segment. Nevertheless, the aforementioned *The Fabricated* licensors routinely interact at high-level industry forums, technical symposia, and procurement bidding processes in both the United States and China—contexts that facilitate informal coordination and information exchange. As Sinopec's principal technology partner, RIPP maintains sustained collaborative relationships with these licensors, enabling coordinated implementation of market strategies and coordinated efforts to influence equipment manufacturers, catalyst suppliers, engineering consultants, and EPC contractors —including the coordinated dissemination of adverse technical assessments regarding CRC's technology to impede CRC's commercial adoption.

58. **Conduct Inconsistent with Independent Economic Rationality (Key Circumstantial Evidence of Collusion)**

CRC's technology delivers demonstrably superior economic returns and quantifiable environmental benefits—specifically, a tenfold improvement in economic efficiency and a reduction of 70 kg in carbon emissions per ton of feedstock. Such advantages would, under normal competitive conditions, render CRC the preferred solution for refiners worldwide. Yet, refineries continue to adopt legacy FCC technologies in international

markets and the energy-intensive, low-efficiency MIP process in China—behavior inconsistent with profit-maximizing decision-making. This persistent deviation from rational market conduct strongly indicates coordinated efforts among the implicated parties to systematically devalue CRC's technology while promoting their own incumbent solutions. Crucially, end-users remain uninformed about CRC's verified performance metrics, reflecting a deliberate informational asymmetry maintained through collective action.

59. **Absence of a credible, fact-based justification:**

(1) To date, no entity has filed formal third-party submissions or substantive objections to CRC's patent applications before the USPTO. Moreover, none of the identified technology licensors—including UOP, Axens, KBR, and —has engaged in technical discourse concerning CRC's underlying scientific principles or its industrial implementation, whether in peer-reviewed literature, industry publications, or public technical forums—including through critical analysis. Such collective silence cannot reasonably be attributed to oversight or ignorance, particularly given CRC's two-decade history of commercial deployment.

(2) **Empirical operational data confirm that no CRC-equipped facility has experienced unplanned shutdowns attributable to CRC system failure; all shutdowns were scheduled for maintenance.** Notably, two CRC units have operated continuously for more than ten years without component replacement—significantly surpassing the industry-standard six-year service life for comparable equipment. In contrast, the MIP Alliance's recent public assertions regarding CRC's "instability" lack technical foundation. These claims stem from documented deviations from CRC's validated operating

procedures—specifically, deliberate noncompliance with prescribed coolant flow rates and temperature gradients—which induced edge-wall effects in CRC coolers. The fabricated performance anomalies were then used to discredit CRC technology itself as inherently flawed. (See Evidence 3.)

## V. COUNTS

60. Defendants allegedly participated in a continuing conspiracy to elevate MIP technology while disparaging and suppressing CRC technology to restrict competition, block global technology markets, and hinder CRC technology's entry into both the U.S. and global markets—thereby violating Sections 1 and 2 of the Sherman Act and related provisions.

### Count I - Violation of Section 1 of the Sherman Act

61. Plaintiffs allege that Defendants engaged in a continuing conspiracy—to make false statements and conceal material litigation information in SEC annual reports or delisting filings, and to systematically disparage and suppress carbon-reducing Cold Regenerated Catalyst Cycling (CRC) technology through Wall Street–based marketing efforts conducted in New York—**supported by written evidence**, thereby restricting trade, excluding competition, and impeding the technology's entry into, commercialization in, and market diffusion across the United States, Europe, and other jurisdictions worldwide. (See paragraphs 18-55)

### Count II - Violation of Section 2 of the Sherman Act

62. Plaintiffs allege a continuing tacit conspiracy—a continuing antitrust violation—that manifests **as an unwritten, horizontal, oligopolistic agreement among FCC licensors,** purposefully designed to exclude competition and foreclose market entry in the United

States, Europe, and other jurisdictions worldwide. This is accomplished through coordinated disparagement and suppression of carbon-reducing CRC technology, coupled with the abuse of dominant market positions—conduct that collectively results in monopolization of the global FCC technology market, including the United States, Europe, and other jurisdictions worldwide. (See paragraphs 18-60.)

## VI. DEMANDS FOR RELIEF

63. Order that the Defendants jointly engaged in a conspiracy to restrain trade and monopolize markets in violation of 15 U.S.C. § 1 and § 2 of the Sherman Act.

64. Hold all Defendants jointly and severally liable for all financial losses sustained by Plaintiffs within the United States, including lost anticipated licensing revenue, foregone market share, and all attorneys' fees, as permitted by law; such damages shall be trebled separately pursuant to U.S. antitrust statutes; actual damages shall be quantified by an independent appraisal conducted by a qualified third party.

65. Issue a permanent injunction restraining Defendants from fabricating technical data, issuing false industry statements, interfering with global patent examination, coercing overseas third parties to refuse to cooperate with Plaintiffs concerning CRC technology, and all other anti-competitive suppression conduct.

66. Compel Defendants to produce all internal communications—including meeting minutes, phone records, and emails—and investor presentation materials related to the conspiracy to restrain trade and monopolize markets.

67. Order Defendants to pay all filing fees, cross-border deposition costs, expert witness fees, and all other litigation expenses incurred by Plaintiffs.

## VII. DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury on all claims for relief presented herein.

## VIII. EXHIBIT LIST

**Exhibit 1**: Complete CRC patent assignment documents

Proof: Ownership of ZL200810146601.8 and corresponding U.S./European PCT applications, establishing Plaintiffs' standing to claim relief.

**Exhibit 2**: 34 items, including CRC technical comparison reports, WIPO Green Technology certification, four international gold medals, and global profit projection reports.

Proof: ⑴CRC's unmatched technical advantages, the substantial $CO_2$-reducing effect, and its substantial global commercial value. ⑵The uniqueness and irreplaceability of CRC technology.

**Exhibit 3**: The fabricated production data, false statements, and industry defamation by the MIP Alliance

Proof: The MIP Alliance has discredited CRC technology by fabricating production data and making false claims, while simultaneously promoting its own MIP technology to achieve "greenwashing."

**Exhibit 4**: CNIPA's examination and reexamination history and administrative litigation history

Proof: Eight years of groundless, serial patent harassment continuing after adverse rulings.

**Exhibit 5** (including 5A-1 and 5A-2): USPTO and EPO examination and appeal histories for the two CRC patents

Proof: Eight years of groundless, serial patent harassment.

**Exhibit 6:** Sinopec historic NYSE annual reports and three MIP invalidity petitions

Proof: Material omissions in U.S. public filings to mislead investors via greenwashing.

**Exhibit 7**: MIP infringement litigation filings and RMB 8.08 billion damage claim supporting documents.

Proof: Concealment of major patent litigation to mislead U.S. and global industry participants.

**Exhibit 8**: Emails, meeting recordings and call logs between Plaintiffs and engineering, consulting and refining entities across U.S., Europe, Korea and Singapore.

Proof: Defendants misled or coerced overseas third parties to boycott CRC, creating substantial risk of lost critical evidence.

**Exhibit 9:** Sinopec and PetroChina's annual and delisting reports submitted to the SEC during their New York listings.

Proof: False statements and the transacted substantial business within the Southern District of New York, establishing jurisdictional contacts.

**Exhibit 10:** Market Share of the World's Leading FCC Licensors.

Proof: The International Oligarchic Alliance dominates over 90% of the global market, and the MIP process dominates over 70% of the China market.

## IX. SIGNATURE BLOCK

Plaintiff 1 (LI QUNZHU) Signature: Qunzhu Li

Date: August 17, 2026

Plaintiff 2 (LI LI) Signature: Li Li

Date: August 17, 2026

国 家 知 识 产 权 局

NATIONAL INTELLECTUAL PROPERTY ADMINISTRATION, PRC

# 专利登记簿副本

专利号:ZL200810146601.8　　　　证书号: 988017

## I 著录项目

发 明 名 称:　一种冷再生催化剂循环方法及其设备
申 请 日:　2008年09月02日
公 开 日:　2010年03月10日
授 权 日:　2012年07月04日
主 分 类 号:　C10G 11/18(2006.01)
发 明 人:　李群柱、李莉

专利权人：香港科瑞因科技有限公司
专利权人地址：中国香港九龙尖沙咀科学馆道14号新文华中心B座7楼701室108单位
专利权人邮政编码：
国籍或注册的国家或地区：中华人民共和国香港特别行政区

## II 法律状态

专利权无效

## Ⅲ 其他登记事项

**专利权授予**
授权公告日期：2012年07月04日

**维持专利权有效**

国家知识产权局
2025年12月30日

国家知识产权局 专利证明专用章 1101081359802

国 家 知 识 产 权 局

NATIONAL INTELLECTUAL PROPERTY ADMINISTRATION, PRC

# 专利登记簿副本

专利号:ZL200810146601.8　　证书号: 988017

案件编号：4W103782
决定号：27479
维持专利权有效决定结案日期：2015年11月12日

**宣告专利权全部无效**
案件编号：4W113955
决定号：581349
宣告专利权全部无效决定结案日期：2024年08月23日

**专利权的转移**
原专利权人名称：李莉
原专利权人邮政编码、地址：471003,河南省洛阳市涧西区联盟路5号雅赛城1号楼5单元1101室
原专利权人国籍或注册的国家或地区：中国

现专利权人名称：洛阳维达石化工程有限公司
现专利权人邮政编码、地址：471000,河南省洛阳市中国（河南）自由贸易试验区洛阳片区高新区丰华路6号银昆科技园1#楼四层405-101
现专利权人国籍或注册的国家或地区：中国

著录项目变更生效日：2023年07月27日

**专利权的转移**
原专利权人名称：洛阳维达石化工程有限公司
原专利权人邮政编码、地址：471000,河南省洛阳市中国（河南）自由贸易试验区洛阳片区高新区丰华路6号银昆科技园1#楼四层405-101

国家知识产权局
2025年12月30日

国家知识产权局专利证明专用章 1101081359802

国 家 知 识 产 权 局

NATIONAL INTELLECTUAL PROPERTY ADMINISTRATION, PRC

# 专利登记簿副本

专利号:ZL200810146601.8 证书号: 988017

原专利权人国籍或注册的国家或地区：中国

现专利权人名称：香港科瑞因科技有限公司
现专利权人邮政编码、地址: ,中国香港九龙尖沙咀科学馆道14号新文华中心B座7楼701室108单位
现专利权人国籍或注册的国家或地区：中华人民共和国香港特别行政区

著录项目变更生效日：2025年12月04日

国家知识产权局
2025年12月30日

国家知识产权局 专利证明专用章 1101081359802

第3页 共4页

国家知识产权局

NATIONAL INTELLECTUAL PROPERTY ADMINISTRATION, PRC

# 专利登记簿副本附页

专利号:ZL200810146601.8 证书号: 988017

I 法律状态动态信息

II 年费信息

第18年年费已缴纳

Ⅲ 其它信息

国家知识产权局

2025年12月30日

国家知识产权局专利证明专用章

1101081359802

US 20120298556A1

(19) **United States**

(12) **Patent Application Publication**

(10) **Pub. No.: US 2012/0298556 A1**

(43) **Pub. Date: Nov. 29, 2012**

**Li et al.**

(54) **METHOD AND EQUIPMENT FOR CIRCULATING COOLED REGENERATED CATALYST**

(76) Inventors: **Li Li**, Luoyang (CN); **Qunzhu Li**, Luoyang (CN)

(21) Appl. No.: **13/576,565**

(22) PCT Filed: **Feb. 11, 2010**

(86) PCT No.: **PCT/CN2010/070661**

§ 371 (c)(1), (2), (4) Date: **Aug. 1, 2012**

**Publication Classification**

(51) **Int. Cl.**

| | |
|---|---|
| ***B01J 38/00*** | (2006.01) |
| ***B01J 8/26*** | (2006.01) |
| ***F27B 15/14*** | (2006.01) |
| ***C10G 11/00*** | (2006.01) |
| ***B01J 8/00*** | (2006.01) |

(52) **U.S. Cl.** .......... **208/113**; 422/619; 422/144; 422/141

(57) **ABSTRACT**

A method for circulating a cooled regenerated catalyst comprises the following steps: a regenerated catalyst derived from a regenerator (**5**) is cooled to 200-720° C. by a catalyst cooler (**8**A), which either directly enters into a riser reactor (**2**) without mixing with hot regenerated catalyst, or enters the same after mixing with another portion of uncooled hot regenerated catalyst and thereby obtaining a hybrid regenerated catalyst with its temperature lower than that of the regenerator; a contact reaction between a hydrocarbon raw materials and the catalyst is performed in the riser reactor (**2**); the reaction product is introduced into a settling vessel (**1**) to separated the catalyst and oil gas; the separated catalyst ready for regeneration is stream-stripped in a stream stripping phase (**1**A) and enters the regenerator (**5**) for regeneration through charring; after cooling, the regenerated catalyst returns to the riser reactor (**2**) for recycling.



(19) Europäisches Patentamt / European Patent Office / Office européen des brevets

(11) EP 2 535 395 A1

(12) **EUROPEAN PATENT APPLICATION**
published in accordance with Art. 153(4) EPC

(43) Date of publication:
**19.12.2012 Bulletin 2012/51**

(21) Application number: **10845485.1**

(22) Date of filing: **11.02.2010**

(51) Int Cl.:
***C10G 11/18*** (2006.01) ***B01J 38/12*** (2006.01)

(86) International application number:
**PCT/CN2010/070661**

(87) International publication number:
**WO 2011/097811 (18.08.2011 Gazette 2011/33)**

(84) Designated Contracting States:
**AT BE BG CH CY CZ DE DK EE ES FI FR GB GR HR HU IE IS IT LI LT LU LV MC MK MT NL NO PL PT RO SE SI SK SM TR**

(71) Applicant: **Li, Li**
**Luoyang, Henan 471003 (CN)**

(72) Inventors:
- **LI, Qunzhu**
**Henan 471003 (CN)**
- **LI, Li**
**Luoyang city**
**Henan 471003 (CN)**

(74) Representative: **Price, Nigel John King**
**J A Kemp**
**14 South Square**
**Gray's Inn**
**London WC1R 5JJ (GB)**

(54) **METHOD AND EQUIPMENT FOR CIRCULATING COOLED REGENERATED CATALYST**

(57) A method for circulating a cooled regenerated catalyst comprises the following steps: a regenerated catalyst derived from a regenerator(5) is cooled to 200-720°C by a catalyst cooler (8A), which either directly enters into a riser reactor (2) without mixing with hot regenerated catalyst, or enters the same after mixing with another portion of uncooled hot regenerated catalyst and thereby obtaining a hybrid regenerated catalyst with its temperature lower than that of the regenerator; a contact reaction between a hydrocarbon raw materials and the catalyst is performed in the riser reactor (2); the reaction product is introduced into a settling vessel (1) to separated the catalyst and oil gas; the separated catalyst ready for regeneration is stream-stripped in a stream stripping phase (1A) and enters the regenerator (5) for regeneration through charring; after cooling, the regenerated catalyst returns to the riser reactor (2) for recycling.




Figure 1

EP 2 535 395 A1

Printed by Jouve, 75001 PARIS (FR)

US 20180021769A1

(19) **United States**

(12) **Patent Application Publication**

(10) **Pub. No.: US 2018/0021769 A1**

(43) **Pub. Date: Jan. 25, 2018**

**Li**

(54) **COLD REGENERATED CATALYST CIRCULATION METHOD AND DEVICE THEREFOR**

(71) Applicant: **Qunzhu Li**, Beichen Donglu (CH)

(72) Inventor: **Qunzhu Li**, Beichen Donglu (CH)

(21) Appl. No.: **15/541,379**

(22) PCT Filed: **Jan. 6, 2016**

(86) PCT No.: **PCT/CN2016/070252**

§ 371 (c)(1),
(2) Date: **Jul. 3, 2017**

(30) **Foreign Application Priority Data**

Jan. 6, 2015 (CN) ......................... 201510004405.7

**Publication Classification**

(51) **Int. Cl.**

| | |
|---|---|
| ***B01J 38/02*** | (2006.01) |
| ***C10G 11/00*** | (2006.01) |
| ***B01J 8/00*** | (2006.01) |
| ***B01J 8/20*** | (2006.01) |
| ***B01J 8/18*** | (2006.01) |

(52) **U.S. Cl.**

CPC ................. ***B01J 38/02*** (2013.01); ***B01J 8/20*** (2013.01); ***B01J 8/1836*** (2013.01); ***B01J 8/007*** (2013.01); ***C10G 11/00*** (2013.01); *B01J 2208/00761* (2013.01)

(57) **ABSTRACT**

The present invention provides a method of cooling and cycling a regenerated catalyst. The regenerated catalyst that is from the regenerator is cooled by the catalyst cooler to 200-720° C., and without being mixed with the hot regenerated catalyst directly enters a riser reactor, or mixes with another part of hot regenerated catalyst that has not been cooled to obtain a mixed regenerated catalyst with a temperature below the regenerator temperature, and enters the riser reactor. The hydrocarbon raw material performs the contact reaction with the catalyst in the riser reactor, a reactant stream enters a settler to perform a separation of the catalyst and an oil gas, the separated spent catalyst is steam stripped by a steam stripping section and enters a regenerator to be charring regenerated, and the regenerated catalyst after being cooled returns to the riser reactor to be circularly used. The bottom of each of the catalyst coolers is provided with at least one fluidized medium distributor, the range of the superficial gas velocity is 0-0.7 m/s (preferably 0.005-0.3 m/s, and most preferably 0.01-0.15 m/s), and the temperature of the cold regenerated catalyst is controlled mainly by adjusting a flow rate of the fluidized medium. The method of cooling and cycling a regenerated catalyst of the present invention has extensive application, and can be used for various fluidized catalytic cracking processes, including heavy oil catalytic cracking, wax oil catalytic cracking, gasoline catalytic conversion reforming and the like, and can also be used for other gas-solid reaction processes, including residual oil pretreating, methanol to olefin, methanol to aromatics, methanol to propylene, fluid coking, flexicoking and the like.

